UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

DIAMOND JUNIOR,                                                          **REPORT AND**
                                                                                        **RECOMMENDATION**


                                                Plaintiff,

v.                                                                                      18-CV-01014-LJV-JJM

ERIE COUNTY MEDICAL CENTER
CORPORATION,

                                                Defendant.
_____

            Plaintiff commenced this Title VII action *pro se,* alleging discrimination by her

former employer, defendant Erie County Medical Center Corporation ("ECMCC"). Complaint

[1].[1]  ECMCC's initial motion to dismiss the Complaint pursuant to Fed. R. Civ. P. ("Rule")

12(b)(6) [13] was granted, without prejudice to plaintiff's right to file an Amended Complaint.

Junior v. Erie County Medical Center Corporation, 2019 WL 1177876 (W.D.N.Y.), adopted,

2019 WL 1171515 (W.D.N.Y. 2019).  Currently before the court is ECMCC's motion [30] to

dismiss the Amended Complaint [24] which has been referred to me by District Judge Lawrence

J. Vilardo for initial consideration [6].  Having reviewed the parties' submissions [30, 31, 34, 35]

and heard oral argument on June 12, 2019 [36], I recommend that the motion be granted in part

and denied in part.

---

[1]        Bracketed references are to the CM/ECF docket entries, and page references are to numbers
reflected on the documents themselves rather than to CM/ECF pagination.

**BACKGROUND**

Plaintiff is an African American woman who began working for ECMCC in 2003. Prior to commencing this suit, plaintiff filed a Verified Complaint with the New York State Division of Human Rights ("NYSDHR") on October 18, 2017 alleging discrimination. Complaint [1], p. 13 of 15.[2]  The alleged discrimination based on her race and age arose in September 2017 while she was working as a Licensed Mental Health Counselor ("LMHC") and she and other staff members were attacked by "an aggressive patient" on their unit. Id., ¶4. When asked whether she "wanted to swap out or was comfortable remaining on the unit", plaintiff replied that she "was comfortable staying" (id.); yet, when plaintiff reported to work the next day, she was allegedly forced to "float to another unit" for her safety. Id., ¶5.  However, her caucasian co-workers, who had also been attacked by the patient, were not required to float.  Id. Plaintiff continued to float until the patient who attacked her was discharged. Id., ¶6.

In contrast to the discrete claim alleged in plaintiff's NYSDHR Verified Complaint, the September 14, 2018 Complaint filed in this action alleged race discrimination, hostile work environment, and retaliation claims in violation of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. §§2000e, *et seq.* ("Title VII"), and the New York State Human Rights Law, N.Y. Exec. Law §§290, *et seq.* ("NYSHRL"), for conduct from May 2014 through her resignation in May 2018.

---

[2]      Generally, "it is well settled that an amended complaint supersedes a prior complaint in its entirety". Wellington v. Langendorf, 2015 WL 401313, *1 n. 2 (N.D.N.Y. 2015).  However, "[f]or the sake of efficiency, and mindful of my obligation to extend special solicitude to *pro se* litigants", I will consider the exhibits attached to the Complaint to be incorporated into the Amended Complaint. Id.

Due to plaintiff's failure to exhaust her administrative remedies for the alleged conduct occurring prior to the September 2017 incident and failure of the Complaint to otherwise state a claim, I recommended that ECMCC's motion to dismiss be granted, without prejudice to plaintiff's right to file an Amended Complaint containing any Title VII claims arising from conduct allegedly occurring in and after September 2017, as well as any NYSHRL claims. 2019 WL 1177876 at *7.  After neither party filed objections to my Report and Recommendation, it was adopted by Judge Vilardo and plaintiff was given 30 days to file an Amended Complaint. 2019 WL 1171515 at *1.[3]

Like the Complaint, the Amended Complaint alleges various employment-related conduct both prior to and after the September 2017 incident detailed in the NYSDHR Verified Complaint.


**Alleged Conduct Preceding the September 2017 Incident**

- **May 2014 - September 2015:  Failure to Hire.**  Plaintiff alleges that between May and June 2014 she applied for three LMHC positions.  Amended Complaint [24], ¶¶6-7.  During this period, she alleges that equally qualified "non-ECMC employees were getting hired that were all Caucasian".  Id., ¶6.  Plaintiff alleges that she was eventually hired as a LMHC in September 2015, and that her hiring was "prolonged" due to her race.  Id., ¶¶7, 10.

- **December 2016 - January 2017:  Cellular Telephone Incidents.**  Plaintiff alleges that on December 29, 2016, "a Caucasian Charge Nurse falsely reported to the unit manager that I was 'violating HIPPA' by being on my cell phone in the nurses station and hallway".  Id., ¶12.

---

[3]    Before Judge Vilardo adopted my Report and Recommendation, plaintiff filed the Amended Complaint.  Because it was premature, Judge Vilardo gave plaintiff the opportunity to file another Amended Complaint, but none has been filed.  2019 WL 1171515, at *1 n.1.

The unit manager also "rolled" her eyes at plaintiff and her "work performance was "unfairly criticized". Id. Allegedly a meeting was conducted concerning cell phone usage at which plaintiff "was singled out and targeted due to [her] race". Id., ¶13. Although the cell phone policy applies to "everyone", plaintiff alleges that on December 30 and 31, 2016 and January 1, 3, and 4, 2017, others, including her Caucasian co-workers used their cellular telephones, but were not reprimanded. Id., ¶¶13-17.

-    **February 2017: Café Incident.** On February 12, 2017, plaintiff allegedly had a confrontation with a café worker over the price of a grilled cheese sandwich, and the next day she had to attend a meeting with her unit manager and the café manager, who both targeted her "as if the incident was [her] fault". Id., ¶¶18-19. Several days later a co-worker allegedly told her that "HR asked him to write a statement against her regarding the café incident", but the co-worker indicated that he would write a statement on her behalf. Id., ¶23.

-    **The February - June 2017: Milieu Incidents.** Plaintiff alleges that two staff members were to be in the "milieu" at all times. Id., ¶20.[4] She alleges that on February 13, 2017, she was "targeted" by the patient advocate, who asked her "why no one was in the milieu", when she had been. Id. On March 21, 2017 plaintiff alleges that she was excluded from "morning report", which she was "almost never allowed to attend", and asked to work alone in the milieu with highly aggressive patients so that everyone else could attend morning report. Id., ¶25. While in the milieu, she allegedly pulled the panic alarm after being "verbally attacked" by an aggressive patient, who also "attempted to physically attack" her. Id. On May 11 and June 21, 2017, plaintiff was allegedly in the milieu alone with "highly aggressive patients". Id., ¶¶30, 31.

---

[4]    Neither the Amended Complaint nor the parties' submissions describe the milieu. Milieu is defined "[i]n psychiatry" as "the social setting of the mental patient". Stedman's Medical Dictionary (28th ed. 2006). As used in the Amended Complaint, it appears that the milieu is a sheltered part of the hospital where mental health patients are confined.

- **February - May 2017:  Other Targeted Conduct.**  Plaintiff broadly alleges that "[s]taff allowed other non-Caucasian staff to mistreat me as well.  They were all in cahoots with each other, against me". Id., ¶22. Specifically, plaintiff alleges that she was singled out to service patients and do other tasks when others were available to do so.  Id., ¶¶22, 24, 29.  She also alleges that her team leader falsely stated that she refused to complete paper work for a patient (id., ¶21), and that her unit manager singled out a Caucasian LMHC for recognition (id., ¶26), delayed her lunch break (id., ¶27), and yelled at her for leaving the unit to conduct hospital business and for being late and using her cellular phone to check in on her son.  Id., ¶¶28, 31.

- **July – September 2017:  Failure to Transfer.** Plaintiff alleges that in July 2017 she tried to transfer to a different department "instead of filing discrimination claims, and risking retaliation or constructive discharge". Id., ¶32.  She allegedly applied to two positions, was "badly badgered by the interviewers", and did not get either position. Id.  Plaintiff does not "know why, except due to my race/color". Id

### Alleged Conduct After the September 2017 Incident

- On September 20, 2017, the unit staff "always expected me to perform duties that they were suppose to be doing, like when I wasn't in the milieu the few times the patient advocate came on the unit, as if I were their personal 'slave'. On this particular day, the LCSW asked me 'why staff always saying 'where's Diamond', when I asked Caitlyn for help'". Id., ¶36. According to plaintiff, she and Caitlyn were the only two senior LMHCs, but that staff treated Caitlyn as plaintiff's supervisor. Id., ¶40;

- on December 22, 2017, "I was the only one expected to be in the milieu".  Id., ¶39;

- on April 23, 2018, her schedule was "switched to accommodate Caitlyn's schedule".

<u>Id</u>., ¶42;

- on April 25, 2018, she was unaware where certain consent forms were located because she was not permitted to attend morning reports, and that later that day she and another staff member helped in the milieu, while Caitlyn "sat there and ignored [the unit manager]".  <u>Id</u>., ¶43;

- on April 30, 2018, the patient advocate "came to trigger and target me . . . stating 'I'm trying to help you', she also stated 'they're still talking about the incident that happened in the café back in February'" <u>Id</u>., ¶44; and

- on May 1, 2018, "I received a disciplinary letter, I then went to speak with Michelle Seay, and that's when she stated, 'you got yourself in trouble and I'm not going to lose  my job because of you', as if she was forced to retaliate against me and make untrue statements.  Then Michelle went to HR and said I 'threatened' her, which is not true, but I was placed on administrative leave, so the next day I submitted my 2 weeks, feeling forced due to the continued racism".  <u>Id</u>., ¶45.  By the time, she resigned, plaintiff alleges that she was the only African-American staff member that remained on that unit. <u>Id</u>., ¶40.

The Amended Complaint, which unlike the Complaint, was not prepared using the *pro se* form, fails to specifically identify the claims being asserted as a result of this conduct.  In any event, since ECMCC treats the Amended Complaint as asserting the same causes of action as the Complaint, I too have treated it as such.

## DISCUSSION

In moving to dismiss plaintiff's Amended Complaint, ECMCC repeats the arguments it made in seeking dismissal of the Complaint - namely, that certain claims are untimely and/or unexhausted, and alternatively, that the allegations fail to state a claim upon which relief can be granted.  ECMCC's Memorandum of Law [31], Points I and II.

### A.    Title VII Claims

#### 1.    Should the Alleged Incidents Occurring Prior to September 2017 be Dismissed as Unexhausted?

"As a precondition to filing a Title VII claim in federal court, a plaintiff must first pursue available administrative remedies and file a timely complaint with the EEOC." Hardaway v. Hartford Public Works Department, 879 F.3d 486, 489 (2d Cir. 2018).  This requirement "applies to *pro se* and counseled plaintiffs alike".  Jones v. Bloomingdale's, 2018 WL 1281819, *3 (S.D.N.Y. 2018).

"[T]he burden of pleading and proving Title VII exhaustion lies with defendants and operates as an affirmative defense". Hardaway, 879 F.3d at 491.  "[E]xhaustion is an affirmative defense and as such can only be a proper basis for a motion to dismiss under Rule 12(b)(6) if failure to exhaust appears on the face of the complaint." Frederic v. NFC Amenity Management, 2018 WL 4735715, *2 (S.D.N.Y. 2018).  Although "exhaustion is an essential element of Title VII's statutory scheme . . . . the failure to exhaust administrative remedies is a precondition to bringing a Title VII claim in federal court, rather than a jurisdictional requirement." Hardaway, 879 F.3d at 489.  "Thus the Title VII exhaustion requirement is subject to equitable defenses." Id., 490.  *See* Jones, 2018 WL 1281819, at *3 (administrative exhaustion is "equitable defenses such as tolling"); Avillan v. Potter, 2002 WL 252479, *3 (S.D.N.Y. 2002)

- 7 -

("[t]he timing and exhaustion requirements of Title VII and the ADEA are subject to equitable tolling and equitable estoppel").

   An exception to the exhaustion requirement also permits claims to "be pursued in a subsequent federal court action if they are 'reasonably related' to those that were filed with the agency." Legnani v. Alitalia Linee Aeree Italiane, S.P.A, 274 F.3d 683, 686 (2d Cir. 2001); Deravin v. Kerik, 335 F.3d 195, 201 (2d Cir. 2003). "A claim is reasonably related to the filed claim if the conduct complained of would fall within the scope of the [administrative] investigation which can reasonably be expected to grow out of the charge that was made." Littlejohn v. City of New York, 795 F.3d 297, 322 (2d Cir. 2015). "'Reasonably related' claims are recognized in three situations: (1) the alleged discriminatory conduct would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination; (2) the claim is one of retaliation by an employer against an employee for filing an EEOC charge; and (3) the plaintiff alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge." Hunt v. Con Edison Co. N.Y.C., 2018 WL 3093970, *5 (E.D.N.Y. 2018) (quoting Terry v. Ashcroft, 336 F.3d 128, 151 (2d Cir. 2003)).

   In the initial Report and Recommendation, I explained that there was conflicting case law on whether reasonably related claims must be based on conduct subsequent to the administrative charge, but found it unnecessary to resolve that conflict, since the alleged events occurring prior to the September 2017 incident would not be expected to fall within the scope of the NYSDHR investigation of the Verified Complaint, which only identified that discrete incident.

   Therefore, I recommended that "ECMCC's motion to dismiss [13] be granted,

without prejudice to plaintiff's right to file an Amended Complaint containing any Title VII claims arising from *conduct in and after September 2017*".  2019 WL 1177876 at *7 (emphasis added).  While Judge Vilardo adopted my Report and Recommendation (to which neither party filed objections), he more broadly gave plaintiff leave to file an Amended Complaint, but without any restrictions on what claims it could contain. 2019 WL 1171515 at *1.

Consequently, rather than relying on the law of the case doctrine, ECMCC argues that "[f]or the same reasons previously articulated by the Court", these claims should again be dismissed.  ECMCC's Memorandum of Law [31], p. 7.  Plaintiff responds that the pre-September 2017 conduct is reasonably related to the September 2017 incident raised in her NYSDHR Verified Complaint.  Plaintiff's Response [34], ¶¶xiii, xv.  That argument is not without support. *See* Williams v. New York City Housing Authority, 458 F.3d 67, 70 (2d Cir. 2006) ("[t]he central question is whether the complaint filed with the EEOC gave that agency adequate notice to investigate discrimination [of the type alleged in the civil complaint]").  In any event, it is unnecessary for me to reconsider that issue.  Even if plaintiff is correct that I erred in my initial Report and Recommendation in concluding that the September 2017 incident would not be expected to fall within the scope of the NYSDHR investigation of the Verified Complaint, I conclude that conduct arising prior to the NYSDHR Verified Complaint cannot, as a matter of law, be considered reasonably related to the conduct raised in that charge.

In my initial Report and Recommendation, I noted that whereas in Butts v. City of New York Department of Housing Preservation and Development, 990 F.2d 1397, 1401 (2d Cir. 1993), the Second Circuit held that a district court may "hear Title VII claims that either are *included in* an EEOC charge or are based on conduct *subsequent* to the EEOC charge which is 'reasonably related' to that alleged in the EEOC charge", *citing* Stewart v. United States

Immigration and Naturalization Service, 762 F.2d 193, 198 (2d Cir. 1985) (emphasis added), some courts have taken a different view of Butts, recognizing that "the court in Stewart, to which Butts cites, merely stated that the reasonably related doctrine included acts subsequent to the filing of EEOC charges; the court did not state that the doctrine was only applicable to subsequent acts . . . .  Furthermore, in Butts, the court actually found that conduct which occurred over a year prior to the filing of EEOC charges, but not specifically included therein, was reasonably related to the charges brought". Fusco v. Cohen, 1998 WL 167299, *1 (N.D.N.Y. 1998).  See 2019 WL 1177876 at *3.

        Although there may be persuasive reasons for why Butts was not correctly decided or should have been worded differently, I remain bound by the plain wording of that decision, which the Second Circuit has reiterated in subsequent decisions.  Hence, "jurisdiction exists over Title VII claims *only* if they have been *included in* an EEOC charge 'or are based on conduct *subsequent* to the EEOC charge which is 'reasonably related' to that alleged in the EEOC charge'". Alfano v. Costello, 294 F.3d 365, 381 (2d Cir. 2002) (emphasis added); Boonmalert v. City of New York, 721 Fed. App'x 29, 31 (2d Cir. 2018) (Summary Order) ("[w]e have jurisdiction to hear only such claims as 'have been included in an EEOC charge or are based on conduct subsequent to the EEOC charge which is reasonably related to that alleged in the EEOC charge'").

        Given the plain language of Butts, it is not surprising that a number of courts, including those within this District, have concluded that the "reasonably related doctrine does not excuse a plaintiff's failure to include allegations in his administrative complaint where those allegations pertained to conduct that had occurred before the administrative complaint was filed." Guerrero v. FJC Security Services Inc., 2012 WL 2053535, *4 (S.D.N.Y. 2012); Danials-

Kirisits v. New York State Office of Court Administration, 2013 WL 1755663, *5 (W.D.N.Y. 2013); Guess v. University of Rochester, 2015 WL 4891377, *6 (W.D.N.Y. 2015); Lester v. M&M Knopf Auto Parts, 2006 WL 2806465, *7 (W.D.N.Y. 2006) Dotson v. New York State Workers Compensation Board, 2018 WL 1183380, *8–9 (N.D.N.Y. 2018); Sternkopf v. White Plains Hospital, 2015 WL 5692183, *8 (S.D.N.Y. 2015); Serrano v. New York State Department of Environmental Conservation, 2017 WL 1194238, *3 (N.D.N.Y. 2017), aff'd, 714 Fed. App'x 90 (2d Cir. 2018) (Summary Order); Johnson v. Long Island University, 58 F. Supp. 3d 211, 219 (E.D.N.Y. 2014); Barroso v. Office of General Counsel, 2013 WL 4048496, *4 (E.D.N.Y. 2013); Bazile v. City of New York, 215 F. Supp. 2d 354, 360 (S.D.N.Y. 2002). Therefore, I recommend that any Title VII claims arising from this conduct be dismissed.

### 2.    Can Plaintiff's Failure to Exhaust her Failure to Hire Claim be Excused?

As discussed above, the Title VII exhaustion requirement is subject to equitable defenses such as equitable estoppel, which "applies when a plaintiff knew of the existence of h[er] cause of action, but the defendant's conduct caused h[er] to bring [the] suit in a defective manner." Avillan, 2002 WL 252479, *3. For the first time in the Amended Complaint, plaintiff alleges that in August 2015, a month prior to her being hired as a LMHC, she went to the NYSDHR and was told that she "could absolutely file a discrimination case", but that "it could prolong [her] getting the LMHC position, and [result in] possible retaliation", so she "decided to wait due to [the NYSDHR] saying [that she had] time to come back and file". Amended Complaint [24], ¶9.

Even fully crediting these allegations, a "general fear of retaliation cannot estop

defendants from raising the failure-to-exhaust affirmative defense". Wells v. Evans, 2016 WL 806871, *6 (W.D.N.Y. 2016). Likewise, a "[f]ear of harm to a plaintiff's career cannot justify equitably estopping a defendant from asserting a time limitation period". Netzer v. Continuity Graphic Associates, Inc., 963 F. Supp. 1308, 1318 (S.D.N.Y. 1997). Therefore, I conclude that plaintiff's failure to exhaust her administrative remedies with respect to this conduct cannot be excused.

3.    **Should the Claims Arising from the Post-September 2017 Conduct be Dismissed as a Result of Plaintiff's Failure to Exhaust Administrative Remedies?**

Unlike its initial motion to dismiss, where ECMCC argued only that plaintiff's claims arising from conduct prior to the September 2017 incident should be dismissed as a result of plaintiff's failure to exhaust administrative remedies (ECMCC's Memorandum of Law [14], pp. 7-8), it now argues that "any claims based on post-September 2017 conduct . . . ought to be dismissed as a result of Plaintiff's failure to exhaust administrative remedies". ECMCC's Memorandum of Law [31], p. 8.

In support of that argument, ECMCC only argues against application of two of the three circumstances under which the reasonably related doctrine is recognized - that the alleged conduct was not in retaliation for the filing of her NYSDHR Verified Complaint on October 18, 2017 and that each incident "cannot be said to have been carried out in precisely the same manner (or for that matter by the same person)". ECMCC's Memorandum of Law [31], p. 8. It does not specifically address whether the alleged discriminatory conduct would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination. Therefore, I recommend that, at this stage, any claims arising from this conduct not be dismissed as unexhausted.

4.      **Are Plaintiff's Claims Sufficiently Pled?**

Alternatively, ECMCC argues that none of the alleged conduct is sufficient to state a claim.  ECMCC's Memorandum of Law [31], Point II.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. . . . A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully . . . . Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Id. "When, as here, the complaint is filed by a *pro se* plaintiff, we construe the complaint liberally, interpreting it to raise the strongest arguments that it suggests." Caro v. Weintraub, 618 F.3d 94, 97 (2d Cir. 2010).

a.      **Discrimination in Terms and Conditions of Employment**

"Title VII prohibits an employer from engaging in intentional employment discrimination - known as 'disparate treatment - on the basis of race or national origin." Mimosa Pham v. Department of Children & Families, 2014 WL 3420470, *2 (D. Conn. 2014). Discrimination cases based on circumstantial evidence brought pursuant to Title VII are analyzed under the familiar burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973). *See* United States v. City of New York, 717 F.3d 72, 83-84 (2d

Cir. 2013) (discussing application of <u>McDonnell Douglas</u> framework to race discrimination

claim). Under this burden-shifting framework, the plaintiff bears the burden of establishing a

*prima facie* case of discrimination by showing that: "1) he belonged to a protected class; 2) he

was qualified for the position; 3) he suffered an adverse employment action; and 4) the adverse

employment action occurred under circumstances giving rise to an inference of discriminatory

intent." <u>Mathirampuzha</u>, 548 F.3d at 78. "To survive a motion to dismiss, a Title VII plaintiff

does not have to plead a full *prima facie* case . . . she need only give plausible support to a

minimal inference of discriminatory motivation." <u>Carris v. First Student, Inc.</u>, 682 Fed. Appx.

30, 32 (2d Cir. 2017) (Summary Order); <u>Vega v. Hempstead Union Free School District</u>, 801

F.3d 72, 84 (2d Cir. 2015).

       "A plaintiff sustains an adverse employment action if he or she endures a

materially adverse change in the terms and conditions of employment. To be 'materially adverse'

a change in working conditions must be more disruptive than a mere inconvenience or an

alteration of job responsibilities. A materially adverse change might be indicated by a

termination of employment, a demotion evidenced by a decrease in wage or salary, a less

distinguished title, a material loss of benefits, significantly diminished material responsibilities,

or other indices unique to a particular situation." <u>Galabya v. New York City Board of Education</u>,

202 F.3d 636, 640 (2d Cir. 2000).

       I agree with ECMCC that at least some of the conduct alleged by

plaintiff is insufficient to rise to the level of an adverse employment action.  For example, in

recommending that the 2017 floating incident did not constitute an adverse employment action, I

stated:

       "In the absence of any allegation that floating resulted in a decrease in pay,

constituted a career setback, subjected her to more dangerous working conditions, or required her to perform materially different job duties, the unscheduled floating assignments that occurred in September 2017 establish no more than a mere inconvenience or an alteration of her job responsibilities . . . . In fact, it appears that she was required to float for her own safety. *See* NYSDHR Determination and Order [1], p. 10 of 15 (CM/ECF) ('[t]he evidence indicates that complainant was required to float to another unit for her own safety, because a particular patient appeared to escalate her aggressive behavior toward complainant, more so than with other employees')." Report and Recommendation [23], pp. 9-10.

The Amended Complaint fails to cure these deficiencies. While plaintiff continues to allege that she was required to float for several days because of her race, no allegations are offered to demonstrate that this constituted an adverse employment action. Amended Complaint [24], ¶¶33-34. In fact, the allegations of the Amended Complaint confirm that she was required to float for her safety, not because of her race. For example, she alleges that the individual who took her place in the unit was not chosen because of his race, but rather "to intimidate the patient, because he was 'bigger' and a male". Amended Complaint [24], ¶33. Nor does it appear that the several days she was required to float extended beyond the time necessary to ensure her safety. Id., ¶34 (plaintiff was told that she could return to the unit because "the patient was 'more mentally stable'").

In any event, plaintiff has sufficiently pled several other forms of conduct that may constitute adverse employment actions. In particular, plaintiff alleges that she was forced to work alone in the milieu on December 22, 2017 ([24], ¶39). Adding context to that allegation, plaintiff alleges that two staff members were required in the milieu at all times (id., ¶20), presumably for safety reasons, but that she was forced to work alone in the milieu with highly aggressive patients. Id., ¶31. *See also* plaintiff's Response [34], ¶¶xxvii ("[t]hey expected me to be in the milieu alone, when there are always supposed to be 2 staff in the milieu at all time, even if short staff, due to the aggressive unit I worked on"). In fact, while working alone in the milieu

on March 21, 2017, she allegedly had to pull the panic alarm because she was "verbally attacked" by an aggressive patient, who also "attempted to physically attack her". Id., ¶25. Therefore, I conclude that working in the milieu alone, even on one occasion, constituted an adverse employment action by exposing plaintiff to a potentially unreasonably dangerous working condition. See Patrolmen's Benevolent Association v. City of New York, 310 F.3d 43, 51–52 (2d Cir. 2002) (transfer of plaintiff police officer to a different precinct where, inter alia, "he feared for his safety", could constitute an adverse employment action for Title VII discrimination purposes); Kasperek v. New York State Department of Corrections and Community Supervision, 2019 WL 2240391, *4 (W.D.N.Y. 2019) (allegations concerning "[d]efendant's failure to provide Plaintiff with a safe working environment - plainly constitute disruptions amounting to more than a mere inconvenience or an alteration in job responsibilities").

Plaintiff also alleges that she was "always expected . . . to perform duties that [her Caucasian co-workers] were suppose to be doing . . . as if I were their "personal 'slave'". Amended Complaint [24], ¶36.  For example, she alleges that she was frequently excluded from "morning reports", which she was entitled to attend, so that the other LMHCs were able to do so, and that this conduct continued into 2018.  Id., ¶¶21, 25, 43.  While "[a]ssignments that are part of an employee's normal responsibilities are not adverse employment actions . . . . a disproportionately heavy workload could perhaps be an adverse action, if the additional work significantly changed the employee's responsibilities so as to diminish that worker's role or status". Bowen-Hooks v. City of New York, 13 F. Supp. 3d 179, 213 (E.D.N.Y. 2014).

Plaintiff further alleges that she was falsely accused by her co-worker Michelle Seay of threatening her, which resulted in her being placed on administrative leave. Amended

Complaint [24], ¶45. ECMCC does not dispute that an administrative leave can constitute an adverse employment action. Instead, it argues that there is no "factual basis to conclude that Plaintiff's administrative leave was the result of unlawful race/color-based discrimination". ECMCC's Memorandum of Law [31], p. 11. I disagree. The Amended Complaint is rife with allegations that the conduct plaintiff experienced was the result of her race. ECMCC also notes that plaintiff's allegations demonstrate that Ms. Seay's conduct was motivated by "self-preservation", rather than race. Id., pp. 10-11. That may (or may not) ultimately be proven true during discovery, but interpreting the Amended Complaint liberally as I must, there are sufficient allegations to suggest that the conduct she experienced was because of her race.

For the first time in reply, ECMCC argues that Ms. Seay is also African American. ECMCC's Reply Memorandum of Law [35], p. 4. However, even if that argument was timely raised, it relies on facts outside of the pleadings. Nor does ECMCC cite to any evidence in support of that argument, which contradicts plaintiff's allegation that she was the only African American staff member on the unit at that time. Amended Complaint [24], ¶40.

While some of plaintiff's allegations of adverse actions, standing alone, do not amount to adverse employment actions, "others plausibly state a claim, and as a group they collectively state a claim". Ruiz v. City of New York, 2015 WL 5146629, *4 (S.D.N.Y. 2015). "Whether discovery will substantiate [p]laintiff's allegations of an adverse employment action remains to be seen, but [she] has pled a plausible claim at the pleading stage of this action." Kasperek, 2019 WL 2240391 at *4.

### b.    Hostile Work Environment

"To state a claim for a hostile work environment in violation of Title VII, a

plaintiff must plead facts that would tend to show that the complained of conduct: (1) is objectively severe or pervasive - that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's [race]." <u>Patane v. Clark</u>, 508 F.3d 106, 113 (2d Cir. 2007). A hostile work environment claim is assessed based on the totality of the circumstances, and in making that assessment courts consider: "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is threatening and humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance." <u>Id</u>. To withstand a motion to dismiss, "a plaintiff need only plead facts sufficient to support the conclusion that she was faced with harassment of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse". <u>Id</u>.

        Standing alone, plaintiff's claims of sustaining "anxiety and depression" as a result of the conduct she experienced (Amended Complaint [24], ¶38) fail to establish the existence of a hostile work environment. ECMCC's Memorandum of Law [31], p. 11. However, collectively the alleged adverse employment actions discussed above, coupled with the other alleged conduct, suffice to state a hostile work environment claim. Again, ECMCC attempts to parse some of the alleged conduct as not being specifically attributable to plaintiff's race. ECMCC's Memorandum of Law [31], p. 11. However, liberally reading the Amended Complaint, as I must, it sufficiently alleges that all of the discriminatory conduct she experienced was the result of her race. Therefore, I recommend that this claim not be dismissed.

### c.    Constructive Discharge

"Constructive discharge is a subset of 'hostile work environment'", <u>Zick v.</u>
<u>Waterfront Commission of New York Harbor</u>, 2012 WL 4785703, \*7 (S.D.N.Y. 2012), "arising
out of particularly pronounced hostile work environments". <u>Pryor v. Jaffe & Asher, LLP</u>, 992 F.
Supp. 2d 252, 257 (S.D.N.Y. 2014). "Case law generally focuses on two parts of this standard:
the employer's intentional conduct and the intolerable level of the work conditions. . . . assessed
objectively by reference to a reasonable person in the employee's position." <u>Petrosino v. Bell</u>
<u>Atlantic</u>, 385 F.3d 210, 229 (2d Cir. 2004). ECMCC argues that the alleged conduct does not
meet the level of conduct necessary for such a claim. ECMCC's Memorandum of Law [31], pp.
14-15. I disagree. A hostile-environment constructive discharge "requires that a plaintiff
sufficiently allege a hostile work environment in order to adequately allege a constructive
discharge claim." <u>Bright-Asante v. Saks & Co., Inc.</u>, 242 F. Supp. 3d 229, 243 (S.D.N.Y. 2017).
As addressed above, the allegations of the Amended Complaint meet that standard. Therefore, I
recommend that this claim not be dismissed.

### d.    Retaliation

Title VII prohibits employers from retaliating "against any . . . employee[ ] . . .
because [s]he has opposed any practice made unlawful" by Title VII. 42 U.S.C. § 2000e-3(a).
"To state a claim for retaliation in violation of Title VII, a plaintiff must plead facts that would
tend to show that: (1) she participated in a protected activity known to the defendant; (2) the
defendant took an employment action disadvantaging her; and (3) there exists a causal
connection between the protected activity and the adverse action." <u>Patane</u>, 508 F.3d at 115.

ECMCC argues that plaintiff fails to establish a causal link between the filing of the NYSDHR Verified Complaint on October 17, 2017, and any of the alleged incidents thereafter.  ECMCC's Memorandum of Law [31], p. 16.  A plaintiff "may not rely on conclusory assertions of retaliatory motive to satisfy the causal link".  Cobb v. Pozzi, 363 F.3d 89, 108 (2d Cir. 2004). It must be established "by showing that the protected activity was closely followed by adverse action, or directly by showing evidence of retaliatory animus".  Jeanty v. Newburgh Beacon Bus Corp., 2018 WL 6047832, *9 (S.D.N.Y.  2018).  Although there is no bright line test, "courts uniformly hold that the temporal proximity must be very close" to establish a causal connection. Raymond v. City of New York, 317 F. Supp. 3d 746, 773–74 (S.D.N.Y. 2018).

Here, the most temporally related conduct occurred when plaintiff was required to work alone in the milieu on December 22, 2017, just over two months after plaintiff's protected activity Amended Complaint [24], ¶39.  "Although the Second Circuit has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship . . . many courts in this circuit have held that periods of two months or more defeat an inference of causation." Ragin v. East Ramapo Central School District, 2010 WL 1326779, *24 (S.D.N.Y. 2010), aff'd, 417 Fed. App'x 81 (2d Cir. 2011) (Summary Order). Moreover, the Amended Complaint fails to allege any causal connection between that incident or any of the subsequent conduct and plaintiff's protected activity.  Plaintiff makes no allegation of any retaliatory animus motivating these incidents or that the actors were even aware of her protected activity.  Dispelling the existence of a retaliatory motive, this conduct mirrors the conduct plaintiff allegedly experienced prior to her protected activity.  Therefore, I recommend that this claim be dismissed.

**B.      NYSHRL Claims**

As discussed in my initial Report and Recommendation, despite the general overlap in pleading requirements between Title VII and the NYSHRL, there are some significant differences. "Unlike Title VII, the NYSHRL does not require exhaustion of administrative remedies prior to commencing a claim under the NYSHRL." Reeve v. SEI/Aaron's, Inc., 2008 WL 905908, *3 (W.D.N.Y. 2008); Ross-Caleb v. City of Rochester, 512 Fed. App'x 17 (2d Cir. 2013) (Summary Order); Cao-Bossa v. Pulcher, 2018 WL 5839692, *6 n. 5 (N.D.N.Y. 2018). Hence, plaintiff's exhaustion arguments do not require dismissal of any of plaintiff's NYSHRL claims, which encompass all of the alleged conduct, including conduct arising prior to September 2017.

**1.      Failure to Hire Claim**

ECMCC argues that plaintiff's failure to hire claim is untimely, since it arose more than three years before she commenced the action on September 14, 2018. ECMCC's Memorandum of Law [31], p. 7 n .7.  For plaintiff's NYSHRL claims, the statute of limitations is three years from when the plaintiff "was informed or had reason to know of the failure to hire".  Walker v. City of New York, 2014 WL 1244778, *6 (S.D.N.Y. 2014); Allen v. New York City Department of Environmental Protection, 51 F. Supp. 3d 504, 511 (S.D.N.Y. 2014).  From the allegations of plaintiff's Amended Complaint, she was aware of the failure to hire since at least August 2015, when she went to the NYSDHR to file a claim for not being hired for the LMHC position. Amended Complaint [24], ¶9.  Since that was more than three years prior to the commencement of this action, it appears to be time-barred.  In fact, plaintiff acknowledges that the claim is untimely.  See Plaintiff's Response [34], ¶xii.

Like exhaustion of administrative remedies, statute of limitations is an affirmative defense and, as such, "may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint". Ellul v. Congregation of Christian Brothers, 774 F.3d 791, 798 n. 12 (2d Cir. 2014).  Though plaintiff appears to allege in the Amended Complaint that she delayed in filing an administrative charge concerning this claim because the NYSDHR indicated that it could lead to retaliation (Amended Complaint [24], ¶9), she makes no allegation that similar concerns dissuaded her from instituting this action.  However, even assuming that plaintiff was alleging that fear of retaliation delayed her from filing this action, "case law suggests that fear of retaliation is not a valid ground for equitable tolling". Davis v. Jackson, 2016 WL 5720811, *9 (S.D.N.Y.  2016); Geiss v. Weinstein Co. Holdings LLC, 2019 WL 1746009, *10 (S.D.N.Y. 2019) ("[o]utside of th[e] unique circumstances [of prisoner litigation], New York law strongly disfavors equitable tolling based on fear of retaliation, except where duress is an element of the cause of action"). Therefore, I recommend that this claim be dismissed.

### 2.    Discrimination, Hostile Work, Constructive Discharge Claims

ECMCC argues that these claims, like plaintiff's Title VII claims, fail to state a claim.  For the reasons discussed above and given consideration of the additional alleged conduct that occurred prior to September 2017, I recommend that these claims not be dismissed.

### 3.    Retaliation Claim

For the same reasons I recommend that plaintiff's Title VII retaliation claim,  I recommend that this claim be dismissed.

**CONCLUSION**

For these reasons, I recommend that ECMCC's motion to dismiss the Amended Complaint [30] be granted to the extent that it seeks dismissal of plaintiff's Title VII claims for disparate treatment, hostile work environment and constructive discharge for alleged conduct occurring prior to September 2017, retaliation claims under Title VII and the NYSHRL, and failure to hire claims under Title VII and the NYSHRL, but otherwise be denied. Unless otherwise ordered by Judge Vilardo, any objections to this Report and Recommendation must be filed with the clerk of this court by September 5, 2019. Any requests for extension of this deadline must be made to Judge Vilardo. A party who "fails to object timely . . . waives any right to further judicial review of [this] decision". Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985). Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) and (c) of this Court's Local Rules of Civil Procedure, written objections shall "specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection . . . supported by legal authority", and must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new

arguments and explaining why they were not raised to the Magistrate Judge".  Failure to comply

with these provisions may result in the district judge's refusal to consider the objections.

Dated: August 19, 2019

   /s/ Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
United States Magistrate Judge